The next case, number 25-1452, Calvary Chapel Belfast v. University of Maine System et al. At this time, would counsel for the appellant please come to the podium and introduce himself on the record to begin? May it please the court, Daniel Schmidt on behalf of the appellant, Calvary Chapel Belfast. If I may, may I reserve two minutes for rebuttal? You may. Thank you. The district court should be reversed in the matter remanded for entry of a preliminary injunction because the University of Maine System violated both the Equal Protection Clause and the Free Exercise Clause by caving to the will of unprecedented community opposition to the award to a religious entity and by effectuating the taint of the community in its decision to rescind the bid. First, the Equal Protection Clause. As is well known, the Equal Protection Clause demands that all similarly situated entities be treated similarly. The government does not escape Equal Protection liability when it gives effect to the outside community biases of individuals in the community. And here we have rampant- Counsel, excuse me. You seem to be arguing almost for a per se rule in the sense that, and there's no question that there was a lot of community controversy about the award here. The University was aware of it. And yet, you had testimony at an evidentiary hearing by the final decision maker for the role in the decision that was made. At the first stage of the process, the university put out a press release asserting that that community uproar had no effect on its decision, would have no effect on its decision making. The district court credited those assertions that when the university made the decision it did, the community animus, if you will, had no effect on them. Why should we not defer to that finding of the district court? When the district court makes a error of law in requiring a standard that is not the standard articulated under Arlington Heights, the decision and the findings made by the district court are entitled to no deference. This is exactly what the Ninth Circuit just issued in Mi Familia, where the district court required what it called a heightened Arlington Heights standard, requiring some showing of a direct connection between the statements in the community and the government action. Here, to your Honor's question, as to the press release that was issued, that was the first half, if you will. So there was unprecedented community outrage to the extent that Robin Sear, who testified both in her deposition and at the evidentiary hearing, that the University of Maine system had never encountered this level of opposition, ever. To the extent that they had to create a formal response system to deal with the complaints. And then the university, Rachel Piper, who is the RFP procurement expert, testified that everything in the RFP complied with the administrative procedures, complied with the terms of the RFP, and ultimately upheld it. And what she said in both her letter and in the university system, again in its press release, said, we can't get rid of the church just because you don't like their religious views. That would violate the 14th Amendment and the First Amendment. But that was halftime. And after halftime, the disappointed bidders ramped up their religious animus. And but for the religious animus specifically and explicitly articulated in the appellate letters that went to Ryan Love, saying that the church is a little fascist factory and you can't, we're not on the same page, tempers are high in the community, frustrations are high in the community, and there's only one guy who can put us on the path together, and it's you. But for those appellate letters, and that's Arlington Heights, if there was any, if it was at least motivated in part, meaning but for the fact that the disappointed bidders brought their religious animus to a sympathetic gear in Ryan Love, he never would have had the authority to rescind the bid. But the record is completely clear that Love was the decision maker. On the second half, yes. The ultimate, he was the second appeal authority, yes. And he made the decision that you're complaining about. Yes, Your Honor. And the district court brought him into the courtroom, looked him in the eye, and he testified that although he was aware of the community opposition, it played no role in his decision. His decision was for reasons other than that. And the district court specifically said, I believe him. Well, given that fact finding, I'm not even understanding how you proceed with your case beyond that, because there's no causal connection between the community opposition and his decision. And that's the error the district court made, is requiring a causal connection. Well, if there's no... Well, Arlington Heights... Well, let's stay with that. Suppose we were to say there's no causal connection. Then what you're saying is every time before a church applies to something from the state, as long as there's community opposition, then we don't have to show any causal connection, so we win every time. Respectfully, that's not what I'm saying, Your Honor. But what you can have, and what happened in the Innovative Health decision in the Second Circuit, and the Mi Familia decision in the Ninth Circuit, and the Town of Clarkston and the Jesus Christ is the answer decisions from the Fourth Circuit, where you had overwhelming significant community outrage, it can taint the process. But it doesn't necessarily mean that the government fails every time. But that's what Arlington Heights says. We look for direct evidence, and we look for circumstantial evidence. Rarely, if ever, and this is what the district court in Massachusetts said in Valentin was, if a church or a racial minority group that was protesting an equal protection violation were required to show statements from the government officials, the 14th Amendment would provide a hollow promise indeed. But the district court didn't require that, and the district court didn't reject the proposition that you could infer from the chronology, just like you could in an employment discrimination case, you could infer that because the community opposition arose, and then the decision came out differently, aha, it was because of. But that's a fact-finding issue, and the district court, after talking with Lowe, concluded that inference didn't get there, and unless you want to say, as Judge Lopez suggested, that you're arguing for a per se inference, then you lose. I don't think so, respectfully, Your Honor, and I don't think I have to argue for a per se rule to get there. This is what Arlington Heights says. We look at the circumstantial evidence, which is the totality of the circumstances. Excuse me, just a minute. Why couldn't the district court believe Lowe and find there was no causal relationship, notwithstanding the possibility that there could have been one? Because, and this is where the other particulars come in under Arlington Heights, so you look for community outrage, sure, we had that unprecedented. You look for, then, were there procedural irregularities? What were the sequence of events that led to the ultimate decision, and did you overrule the experts that were on the ground? That's exactly what happened in Innovative Health Services, Jesus Christ is the answer, Avenue 6 East out of the Ninth Circuit, United States versus Yonkers out of the Second Circuit, the Chabot decision out of the Second Circuit, every single one of them. You had significant community opposition. Are you saying Lowe lied? He created a pretext, and what I'm saying is the district court's finding there, when you- He created a pretext is kind of a lawyer's way of saying he lied. Well, he, and this is what the district court, or the district court in Valentin said, and then Palmar versus Ciotti, of course, government officials don't come out and say, well, yeah, I got rid of the church because it's religious. No one does that, so that's why we have to look at the circumstantial evidence. I understand, you recognize the difficulty you have in trying to undo a credibility determination in the district court, so quite appropriately, it serves your interest to create and to argue for an error of law in the district court's analysis. I am trying to understand what that error of law was. You keep talking about the district court required some kind of a direct connection between the community animus and the decision of the university. What do you mean by that? Where did the district court, in effect, overstate the showing that your clients had to make in order to establish this animus? I just don't see where the district court did that. It was in the opinion, it was both in the TRO opinion and the preliminary injunction opinion, which is on appeal and addendum at page 17. Okay, and what exactly was it? Where she said, the plaintiffs failed because they have not made a showing connecting the animus to the ultimate decision, and that's exactly what Me Familia did, and what she did was exactly what the district court did in Me Familia and what the Ninth Circuit said was clear error. But counsel, if she doesn't require that kind of showing, you are arguing for a per se rule. You are arguing that in the face of this widespread community opposition, it would be impossible for the university to make a decision that was not tainted by the community animus. That argument of impossibility strikes me as a per se rule. It's not, respectfully, your honor, and the reason is because you have to look at the totality of circumstances. Well, that's what the district court did. But she required them, she looked at them in isolation and said, this one doesn't directly connect to the decision, so that's not enough. But the sequence of events leading up to it, and this is where if you look at the big picture, which is all the cases that I've talked about here, I'm not arguing for a per se rule, but if the government doesn't engage in an ultimate pretext, if Ryan Lowe had legitimate reasons for rescinding the bid and didn't reject the findings of his procurement experts, which is what happened in all the decisions I just mentioned to you a moment ago and that we articulated in our briefs, perhaps he had a reason. But what he said was the cost savings rationale of moving the internet hub was a sufficient reason to rescind the church's bid, and what that was was a solution in search of a problem because they didn't have one. The lease provision in addendum four that was negotiated and known by all the responsive bidders before gave the university system the unilateral option for 60 years to maintain the internet hub in its place, and at their sole discretion, they never had to spend a dime to move. But counsel, look what happened here. Yes, because of this cost savings issue, they went through a second round of bidding, and the result of that was that one of the bidders proposed a purchase price of $3 million, $2 million more than your client proposed. On their analysis, your client's proposal, if you subtract from the million dollars, the $500,000 cost of building this new facility only yielded $500,000 for the university when the indebtedness on the building was $900,000. So I mean, and the district court looked at that, analyzed all of that, and said that the university had perfectly good reasons, not influenced by animus, good business reasons to do what they did. What's wrong with that analysis? Well, respectfully, your honor, I think the first part of your question where we're looking at the second part of the, in the second RFP, no one disputes, and we would not be here if it hadn't been for the discrimination in the first RFP. The church did not win the second one, they were outbid. But there's a reason we do these anonymously so that everybody doesn't have to think. The second RFP is not the issue. The problem is the rescission of the first one. And it's interesting you bring up the numbers, your honor, because what Calvary Chapel's bid in the award deck was, is we'll give you a million dollars for the building and the perpetual lease. Now the university system found the perpetual lease option significant there, which the district court says everybody assumed, if I may finish my, everybody assumed that this thing was going to move. But that was directly contrary to the language in the addendum four that the university gave themselves the option to. And the purported cost savings that Ryan Lowe was articulating was a $500,000 bid plus a purported $500,000 cost savings. So the numbers were equal at the end of the day between the two bids, and he blew up the entire process, contrary to his experts below, in the attempt of creating a solution to a problem. He didn't save them any money to begin with. Can I just, I want to ask you a different question that may not actually really matter here. But usually when we see these type of equal protection cases, we see a very clear, here are the similarly situated people that we're arguing were treated differently. Who are those? Are you arguing that those are the other bidders here, the comparators that we're supposed to look at to do this analysis? It's a fair point, Your Honor. And I think the first caveat to your question might be the relevant. Everyone agreed that everybody was similarly situated here. That's below. That they were, the comparators were to the other bidders. I think what Your Honor's question necessitates is where this most often comes up is in the zoning context or in some other land use where we're in a RLUIPA context. And where you're looking at, well, the church was not given the zoning permit or the racial minority group that was going to do low-income housing like in the Jesus Christ is the Answer and the others, where they weren't given the same permissive zoning permit that were given to other groups. That's not really what we have here. So what we're looking at is in the intentional discrimination claim under the Equal Protection Clause. And what you have to prove there under the Arlington Heights standard is that the government made a decision that was responsive to outrage in the community. And then you look at the totality of circumstances and the factors that I had just articulated, which are the, whether they overlooked or overruled expert opinions that reached a contrary decision. Whether there were pretextual decisions arising from it. Was there a solution in search of a problem, which is what we had here. And if you look at all of that, the sequence of it does. The fact-finding issues that we've discussed here, but okay. Thank you for that. Thank you for that answer. Your time is up. Thank you, counsel. At this time, would counsel for the appellees please introduce yourself on the record to begin? Good morning, Melissa Huey for the Appellee University of Maine System. So, I think that the parties and the court all agree on most of the legal principles that govern this case. We all agree that in order to prevail on an equal protection claim, a plaintiff need only show that discriminatory intent was a motivating factor, not the only factor. We all agree that community animus can give rise to a presumption of discriminatory intent. We all agree that if the decision-maker departed from its normal procedure, that could be evidence of discriminatory intent. Where the court... Excuse me, counsel. Yes. You just said that we all agree that in the presence of community animus, there is a presumption that the governmental decision-makers acted also? I said it can give rise to a presumption under the right circumstances. Where the church goes astray, as you have already identified, is by seemingly suggesting that if the community animus is loud enough, that compels a finding of discriminatory intent. And I don't think that there is any case law that supports that and in fact, if there were, that would be directly in violation of what the Supreme Court held in Arlington Heights, namely that there must be discriminatory intent to prevail on an equal protection clause. What the church is saying here, recognizing as everybody does, that in order to prevail on this case, they would need to find a legal issue, is that because the district court stated that there needed to be a connection between community animus and the decision, that's an error of law. In fact, that's the only way it could be. In other words, if you're going to find discriminatory intent, you have to, based on community animus, there has to be some connection. You have to show, the plaintiff has to prove that the community animus motivated, at least in part, the discriminatory intent. That is a correct, not a statement of the law, not an error of the law. And that then takes us right into the clear error standard, which I think is pretty clear they cannot prevail on. On that issue, I just want to touch on a couple of things. First, counsel has suggested repeatedly that it was problematic for Ryan Lowe not to accept what his experts said. This is an appeal. And if the rule was that the person hearing the appeal had to accept what the lower people said, there would be no point in an appeal. So that doesn't make any sense. But is that really fair? Is that the point that opposing counsel is making? I thought opposing counsel was saying that if lower level officials acknowledged that there was no need for a second RFP, or whatever the advice was, and he disregarded that, that disregard of what his underlings were telling him at least raises a reasonable question about his assertion that religious animus played no role. In other words, that would be an example of a procedural irregularity that the court said in Arlington Heights is a relevant factor in deciding the discriminatory intent issue. And I don't remember the district court dealing with that issue. So I'm not sure what opposing counsel is saying. But I think what opposing counsel is saying is that Mr. Lowe is bound to accept the opinion of Rachel Piper, who decided the appeal below. It is true in his decision that he expressly addressed this. He said she decided that cost savings was not a part of the analysis. I understand why she did that. But I, as the chief financial person in the university, disagree with that. And I think this is an important thing. And that's why I am overturning the RFP. So I think it was dealt with. I don't think it's a procedural irregularity. And indeed, Ms. Piper testified on the stand that this is exactly the way the appeals process is supposed to work. Different people review it. And ultimately, the ultimate decision maker comes out with the decision. The other issue I just want to address briefly, and this is a little bit aside of Judge Montecavlo's points, but I think it's kind of the same about the similarly situated. And that is with regard to the supposed procedural error. And I think that the terminology procedural error is better framed the way the Supreme Court did in Arlington Heights, which is a departure from normal procedures. So in other words, there might be some procedural thing that a court looking over thinks shouldn't have been done. That isn't really, that doesn't prove anything about whether the articulated reason is pretext. But if the decision maker does something different than it's done in the past, that says, well, maybe something's going on here. In this case, there was no evidence whatsoever that this appeal or this RFP had been treated differently than anyone else. There's a lot of discussion in the brief about specification versus award appeals. There was no testimony that there had ever been a specification appeal before. So we aren't treating this differently. And in terms of things like the lease, it is true that if someone parses through that lease, you could find what counsel found, not by the time of the TRO, but by the time of the preliminary injunction. But it's also true, as the court pointed out, that every witness that testified, testified that they assumed that the hub would be moved, that addendum four specifically required that the hub be moved. So there really isn't anything to the various procedural irregularities that they pointed out. That was partially what I was wondering. I didn't see any evidence. It occurred to me that better comparators might have been bidders from years past, and then you could establish that maybe this procedure here had never happened before. But I didn't see any evidence of that, or any evidence of that, even with the comparators, except in the comparators here are the current bidders. Yes. And I think that's my point, and I think that's what Arlington Heights was getting at. You look at how this entity has done things before. They've always done things A, B, C, D. And then suddenly, when there's a, somebody with a protected status involved, they do A, B, C, R. Then that looks strange. In this case, there was no testimony about treatment of anybody other than this particular RFP. And the testimony, as the judge said, weighed heavily in favor of the fact that the decision was made without discriminatory intent. There was... Has the facility been sold? Has the transaction closed? The transaction has not closed because of the pendency of this appeal. But there was no injunction preventing it from closing? There wasn't. And this is an appeal not from a final judgment, but from a decision denying a motion for a preliminary injunction? Yes. Now, the preliminary injunction, I think, actually requested that the parties not negotiate a contract. And I do believe that the parties, the winning bidder and the system, have been negotiating. So we've moved farther than we were at the temporary restraining and preliminary injunctions stage, just to be clear. Counsel, doesn't opposing counsel, on this issue of procedural irregularities, I mean, they're on both, I guess you'd call it the substantive irregularity and the procedural one, there were issues there that the district court had to explain away. I mean, the lease, which went out as part of the initial RFP, had this word option in it, which suggested that it really shouldn't be treated as a revelation, when one of the parties suggested a way in which this communication facility could be kept in the building, they wouldn't have to spend all this extra money. And so the court found that nevertheless, everybody understood that it was an assumption that there would be a separate building created. So that option language did support their position. And then on the cost savings issue, there was testimony that cost savings was a legitimate issue to consider as part of the initial RFP. So to the extent that Mr. Lowe said, well, we have a proposal that suggested there could be enormous cost savings, and that requires us to go through a second round. There was really contrary evidence, was there not, that that really wasn't necessary? I don't believe there was. I think what the, on the cost savings issue, I think what the issue was, was that the Waterfall Arts submitted the creative proposal, and they argued that they didn't get the benefit of cost savings in the scoring of their proposal. And Rachel Piper, in deciding the appeal, said, no, you didn't get the benefit because that wasn't part of our scoring criteria. So then Ryan Lowe says, well, it should have been. And that's one of the reasons why I'm overturning the RFP. As to the first issue you raised. The option language. I think you have to look at what's the purpose of looking at a procedural irregularity. And the purpose is to find out, to ferret out whether the reason articulated by the decision maker is pretext. So in this case, Ryan Lowe's testimony, that the judge said was credible and accepted, was that he didn't realize that that's what the lease said until his deposition was taken. So that could not have been a procedural irregularity that raises the suggestion that his decision was pretextual. Just on that option point, didn't, I think you represent, in one of the briefs that Pastor Houston, I believe, that he acknowledged, he understood that everybody was proceeding on the premise that there would have to be a separate building. Is that? Yes. So he, and I think the district court noted that, that that was part of the shared understanding. Is that correct? Yes. He did testify about that. Understanding at the hearing. And unless there are further questions, thank you. Thank you, counsel. At this time, counsel for the, excuse me, at this time, counsel for the appellant, please reintroduce himself on the record. He has a two-minute rebuttal. Thank you, your honors. Daniel Schmidt, again, on behalf of Calvary Chapel Belfast. We spent a lot of time talking originally about, and necessarily so, the district court's factual findings and how this court can get there under a clear error standard. The, for one, it's not a rubber stamp. That's what the United States Supreme Court has said. And one of the ways this court can find that a clear error has been made on a factual finding is giving credibility determinations to testimony that is directly contradicted by the documentary evidence. That's the Supreme Court's decision in Anderson versus Bossa Merced, where if the documentary evidence contradicts specifically what the testimony of the witness was that the district court deems credible, it's no longer credible. That's clear error. You can find a clear error there. Here, we have that. Here, the district court credited testimony from Ryan Lowe that the everybody thought the option was going to go away. The cost savings rationale was there when all of that stuff was already accounted for in the RFP, and it was the option to keep the hub in place for 60 years was explicitly stated in the documents. And you're, Judge Lippitz, you asked a question at the end of my colleague's colloquy with you, which was, well, everybody testified, and maybe it was you, Judge Monteclava. Everybody testified that, well, we are operating under the assumption that it might move. But that's not how we do contract law. The assumption of the parties doesn't override the text of the document. And here, the text of the RFP, in addendum form, that everybody was provided before their responses were submitted, gave the university the option to keep it there for 60 years, and that was the sole reason that Ryan Lowe gave for rescinding the contract. And I want to go back to, Judge Lippitz, your question before about the per se rule and whether I'm asking for a per se rule. I'm not. And respectfully, the reason for that is it doesn't mean, just because there's community outrage expressing hostility towards some minor or minority group, it doesn't mean it's per se unconstitutional. What it means is if you have the circumstantial and direct evidence that the government just has to satisfy strict scrutiny. It's not that it's per se unconstitutional. It's just that it's a higher standard. And that's exactly what the Equal Protection Clause was meant to obtain. And that's exactly why the district court committed error and exactly why this court should reverse. And I thank your honors for your time. Thank you. Thank you, counsel. That concludes argument in this case.